UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: CERTAINTEED CORPORATION ROOFING SHINGLES PRODUCTS LIABILITY LITIGATION | : : : : | MDL DOCKET NO. 1817 |
| This Memorandum relates to: ALL CASES | : : : : | |

**CERTAINTEED CORPORATION'S MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

After more than three years of litigation that included extensive discovery and hard fought settlement negotiations, the parties in this products liability class action have agreed upon a proposed settlement ("the Settlement"). The Settlement terms are set forth in the Settlement Agreement that the Plaintiffs, through class counsel, and the Defendant, CertainTeed Corporation ("CertainTeed"), executed on December 15, 2009. CertainTeed files this Memorandum to join in Plaintiffs' request that this Court (1) certify this case as a class action for settlement purposes; (2) preliminarily approve the Settlement and set a date for a Final Approval Hearing; and (3) direct notice of the settlement to the Settlement Class Members as set forth in the Notice Program agreed upon by the parties. Attached as Exhibit D to the Settlement Agreement is the parties' proposed Order Granting Preliminary Approval Of Settlement Agreement, Certifying Case As A Class Action In Light Of The Settlement, Defining Settlement Class, And Providing For Notice Of Settlement Class Certification, Settlement, And Settlement Hearing. CertainTeed respectfully joins in Plaintiffs' request that the Court enter an order substantially in the form of that proposed order.

## FACTUAL BACKGROUND

In this litigation, relying upon a broad panoply of legal theories, Plaintiffs contend, in essence, that organic asphalt shingles manufactured by CertainTeed from July 1, 1987 through 2005 ("Organic Shingles"[1]) are subject to premature failure and otherwise do not perform in accordance with the reasonable expectations of users. CertainTeed denies these allegations and asserts that the vast majority of the Organic Shingles are free of any defect and will last throughout their warranty periods. There are substantial grounds for difference of opinion regarding both these issues of liability and the adequacy of the compensation under CertainTeed's warranties to remedy the defects about which the Plaintiffs complain.

To resolve these claims, the parties have agreed to the certification of a Settlement Class that consists of all current owners of buildings on which CertainTeed's organic shingles are or were installed, as well as a limited number of former owners of such buildings who retained their claims against CertainTeed when they sold or transferred the building or who settled their warranty claims against CertainTeed during the pendency of this litigation. Specifically, the proposed Settlement resolves the claims of:

> All individuals and entities that own, as of December 15, 2009 [the date of the Settlement Agreement], homes, residences, buildings, or other structures located in the United States or Canada whose roofs contain or contained roofing shingles made with a felt reinforcement base material that is saturated with asphalt, also known as organic roofing shingles, manufactured by CertainTeed after July 1, 1987; all individuals and entities who previously owned such a building and who, prior to December 15, 2009, sold or transferred the building and at the time of the sale or transfer retained the right to make a claim for the shingles pursuant to a valid documented assignment; and all individuals and entities who owned such a building and who, between August 1, 2006, and the Effective Date of this Agreement, have settled or settle their warranty claims for such shingles.

---

[1] At least since the filing of their motion for certification of a litigation class, Plaintiffs have focused their claims on Organic Shingles, as contrasted with those shingles that are manufactured with fiberglass. Under the Settlement, claims of building owners with fiberglass shingles on their roofs are to be dismissed *without* prejudice.

Each member of the Settlement Class is eligible to make a claim under this claims-made Settlement in which the amount to be paid per claimant is determined based on factors identified in the Settlement Agreement regardless of how many or how few claims are actually filed. The amount paid per claimant depends upon a number of factors such as (1) whether the claimant originally purchased the shingles; (2) the terms of the warranty; (3) how many damaged shingles are on the roof; (4) how long the shingles have been on the roof; (5) whether the shingles are damaged as defined in the Settlement Agreement; (6) whether the damage was due to a manufacturing defect or was caused by circumstances outside of CertainTeed's control; and (7) whether the claimant has already settled the warranty claim under CertainTeed's standard warranty. In summary, however, the Agreement provides three levels of compensation.

First, for Settlement Class Members who are qualified to assert warranty claims when their shingles manifest Damage as defined in the Settlement Agreement prior to the expiration of the applicable warranty period, the Settlement provides enhanced compensation if the Damage is caused by a product defect. Absent this settlement, if the Organic Shingles proved defective after a specified 3 to 5 year period following their installation[2] but within the warranty period specified for the particular brand of shingles, building owners who purchased and installed the shingles or who bought newly constructed buildings on which the shingles had been installed would be reimbursed for the replacement cost of the shingles prorated to reflect the number of months of service the shingles had provided; they would not be reimbursed for labor costs or costs of materials other than the shingles. Plaintiffs have contended that this compensation is insufficient when the shingles are defective. To resolve this dispute, the Settlement Agreement provides enhanced compensation for such persons, as set forth in Paragraph 6.6 of the Settlement Agreement: U.S.$74 per square (that is, per 100 square feet of roofing shingles) -- $34 per square for the cost of replacement shingles and the remaining $40 per square for the cost of labor

---

[2] Each shingle warranty beginning in 1989 has a feature called SureStart protection, which provides full replacement or repair cost, including applicable labor costs, but excluding tear off and metal work, for a specified period if the building owner has a compensable warranty claim. The SureStart protection period runs from three to five years depending on the shingle product. The Settlement Agreement maintains this SureStart protection.

3

and other materials -- which is to be discounted in accordance with a formula set forth in the Settlement Agreement to account for the number of months of use the claimant has received from the shingles. CertainTeed will continue to pay this enhanced compensation so long as the Claimant could have asserted a warranty claim – up to 25 years from now for those shingles that were covered by a thirty year warranty and that were installed in 2005, the last year that CertainTeed manufactured Organic Shingles.

       The second level of compensation is available to Settlement Class Members who bought a previously-occupied building with the shingles already installed. With some exceptions, CertainTeed's limited warranties do not cover such transferees.[3] Applicable warranty law permits exclusion of such persons from warranty coverage by limiting the warranty to original purchasers only; therefore, these Settlement Class Members' legal claims are much weaker than those of Settlement Class Members who are qualified to assert warranty claims. Nevertheless, Plaintiffs contend that those persons, who may have purchased the building based on the representation from the previous owner that the shingles were 20, 25, or 30 year shingles, are also entitled to compensation when their shingles are defective. To resolve this dispute in light of the relevant facts and law, the Settlement provides benefits at a reduced rate to Settlement Class Members who were precluded from making claims under CertainTeed's warranties, provided they submit their claims within twelve months of the Settlement becoming effective. Compensation for such Settlement Class Members is set forth in Paragraph 6.7 of the Settlement Agreement: US$34 per square, which again is to be discounted proportionately to account for the number of months of use the claimant and his or her predecessor owner has received from the shingles.

       The third level of compensation is available to Settlement Class Members who settled their warranty claim after the commencement of this Litigation. As the Court is aware, throughout the pendency of this Litigation, CertainTeed has continued settling claims made

---

[3] When the applicable warranty does provide coverage for transferees, the Agreement provides that the transferee is eligible for compensation pursuant to paragraph 6.6, described above.

under its warranties, obtaining general releases from claimants as consideration for its payments. Plaintiffs contend that this practice was over-reaching because the claimants were asserting only warranty claims, yet released broader claims as well. Nevertheless, Plaintiffs recognize that persons who elected to settle their claims without awaiting the uncertain outcome of the Litigation did receive the benefit of early payment not received by other Settlement Class Members. To resolve this dispute in light of the relevant facts and law, the Settlement provides that persons who settled their claims after the start of the Litigation receive 20% of the difference between the amount they received for their warranty claim and any greater amount they would have received had they awaited the outcome of the Litigation. *See* Paragraph 6.8 of the Settlement Agreement.

Because settlement of the Litigation on these terms would be fair, reasonable, and adequate, CertainTeed joins in Plaintiffs' request that this Court (1) certify this case as a class action for settlement purposes; (2) preliminarily approve the Settlement, subject to a Final Approval Hearing; and (3) direct notice of the Settlement to the Settlement Class Members as set forth in the Notice Program agreed upon by the parties.

## LEGAL ARGUMENT

### I.  A Settlement Class Should Be Certified To Effectuate the Settlement.

This case should be certified as a class action for settlement purposes because, as discussed in detail below, this case satisfies the requirements of Federal Rule of Civil Procedure 23 for a settlement class.

#### A.  The Prerequisites of Rule 23(a) Are Satisfied

To certify a settlement class, the court must first determine whether the class satisfies the numerosity, commonality, typicality and adequacy requirements set forth in Rule 23(a). Each of those prerequisites is satisfied here.

**Numerosity**

The Rule 23(a)(1) requirement of numerosity is plainly satisfied. Although exact figures are not available, CertainTeed estimates that over a million buildings in the United States and Canada have CertainTeed organic asphalt shingle roofs. *See* Declaration of Dale H. Walton, CertainTeed's Warranty Services Manager ("Walton Declaration") at ¶. 4.

**Commonality**

The second requirement is that of commonality, which simply requires that there are questions of law or fact common to the class. This standard is satisfied where "'the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'" *In re Prudential Ins. Co. Amer. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 310 (3d Cir. 1998) (quoting *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994)). There are questions of law and fact in common to the class in the present case. The gravamen of Plaintiffs' theory rests on their claim that the Organic Shingles suffer from a common defect and thus are substantially unlikely to last throughout the 20 to 30 year warranty period; and that CertainTeed knew this and nevertheless persisted in inducing sales based on the lengthy warranty period while providing warranty protection so limited that it was inadequate to compensate the purchaser for the premature failure of the shingles. Common questions therefore include:

1. Whether all Organic Shingles manufactured within the class period were subject to a common defect capable of common proof;

2. Whether the evidence of early product failure in a small percentage of Organic Shingles is sufficient to support Plaintiffs' contention that all Organic Shingles were substantially likely to fail;

3. Whether CertainTeed set its product warranty without reference to actual expected duration of the shingles;

4. Whether CertainTeed and purchasers of its shingles are bound by the terms of the limited warranty, or whether Plaintiffs may take one term of the limited warranty—its length—and convert it into an unconditional guarantee by CertainTeed under any of the Plaintiffs' legal theories.

**Typicality**

To determine whether the class representatives meet the requirement of typicality, the Court must evaluate whether their interests in the proposed litigation are sufficiently aligned with those of the proposed class. "'[F]actual differences will not render a claim atypical if the claim arises from the same . . . practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.'" *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006) (quoting *Baby Neal*, 43 F.3d at 58). The requirement may be met despite the existence of distinctions between the claims of the named plaintiffs and the proposed class:

> Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims.

*In re Prudential*, 148 F.3d at 311 (quoting *Baby Neal*, 43 F.3d at 58). In this case, the class complaint alleges that the Organic Shingles were defective and that the existence of the term length in CertainTeed's shingle warranties constituted a misrepresentation that induced people to buy the defective shingles (or buildings with previously installed shingles) believing that the warranty length fairly represented the probable life of the shingles. Thus, the class representatives are typical of all Settlement Class members in that they are asserting claims based on the same alleged unlawful conduct.

**Adequacy**

The requirement for adequacy of representation "encompasses two distinct inquiries designed to protect the interests of absentee class members: 'it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees', and it tests the qualifications of the counsel to represent the class.'"[4] *In re Cmty Bank of Northern Virginia*, 418 F.3d 277, 303 (3d Cir. 2005) (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab.*

---

[4] With respect to the qualifications of Plaintiffs' counsel, CertainTeed does not contest counsel's long experience, high reputation, or the vigorousness with which they have represented their clients, and leaves any argument on that point to class counsel.

7

*Litig.*, 55 F.3d 768, 800 (3d Cir. 1995)). In this case, the class representatives' interests are so aligned. Even though some class representatives may have claims different from some class members, based on differences in the application of state law or on individual factual situations, adequacy of representation does not demand 100% uniformity among the class. *See, e.g., In re Prudential*, 148 F.3d at 313 (finding adequacy of representation even though none of the named representatives had asserted a certain group of claims that were being settled under the settlement agreement because "[t]he named parties, like the members of the class, would need to establish [the alleged deceptive sales practice scheme] in order to succeed on any of the claims in the [complaint]. Even those class members with [the claims not shared by the class representatives] share the common task of demonstrating the existence and implementation of this scheme.").

### B.   A Settlement Class Is Properly Certified Under Rule 23(b)(3)

In addition to satisfying the prerequisites of Rule 23(a), a class can be certified only if the requirements of one of the sections of Rule 23(b) are also satisfied. Here, the parties urge the Court to certify a settlement class under Rule 23(b)(3), which provides in pertinent part:

> (b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: ...
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

**Predominance**

Although the predominance requirement must be satisfied whether the class is a litigation class or a settlement class,[5] the focus of the inquiry changes significantly depending on which type of class is at issue. Considerations of subparagraph (D), for instance, relating to manageability of the class action, are highly relevant to a litigation class, but become irrelevant in the case of a case of a settlement class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 593 (1997) ("Whether trial would present intractable management problems . . . is not a consideration when settlement-only certification is requested, for the proposal is that there be no trial.").

In the case of a settlement class, the "predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. "Th[e] inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement, and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 594. The Supreme Court has warned that a settlement class should be viewed with "caution when individual stakes are high and disparities among class members great." *Id.* On the other hand, "predominance is a test readily met in certain cases alleging consumer or securities fraud. . . ." *Id.* at 625.

Particularly because all of the claims in this case are relatively small and in the nature of consumer fraud, case law in this Circuit applying the test of predominance in settlement classes in light of *Amchem* shows that the requirement is met in the proposed settlement class. *See, e.g.*,

---

[5] The proposed settlement is of a settlement class, a vehicle that "offers defendants the opportunity to engage in settlement negotiations without conceding any of the arguments they may have against class certification." *In re Cmty Bank of Northern Virginia*, 418 F.3d at 299. Were this a proposed litigation class, particularly when the stringent standards of *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305 (3d Cir. 2008), are applied, it might well fail to pass the Rule 23(b)(3) predominance requirement. Merely by way of example, one of Plaintiffs' key common factual issues is their contention that the shingles share a common defect that causes their failure or makes them substantially likely to fail prior to the expiration of the warranty period. CertainTeed can present evidence that there is no common defect—where product problems exist, they are the product of errors specific to the plant or specifications that govern manufacturing procedures for individual products at individual plants at particular points in time. In the absence of evidence sufficient to establish a common defect, a litigation class could not be certified because individual issues would likely predominate. Moreover, the application of the law to the facts in this case would have required that all of the claims be resolved under the law of the state where the building is located rather than under Pennsylvania law alone as Plaintiffs proposed. The settlement class, however, may properly bypass this host of individual issues regarding CertainTeed's liability because CertainTeed may waive assertion of these defenses in a settlement context.

*In re Prudential*, 148 F.3d at 315 (holding that in a settlement class in which plaintiffs alleged that Prudential engaged in a common course of conduct by which it defrauded class members, common questions predominated over individual questions such as whether claimants relied on the alleged misrepresentations); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 290 (E.D. Pa. 2003) (finding that in a settlement class where plaintiffs alleged that defendant failed to inform customers about and actively concealed the risks of using conventional oil in vehicles equipped with a Flexible Service System, common issues predominated despite existence of individual issues); *First State Orthopaedics v. Concentra, Inc.*, 534 F.Supp.2d 500, 511 (E.D. Pa. 2007) (concluding that allegations of standardized misconduct applicable to all class members predominated over individual differences in rights and remedies applicable under state laws).

### Superiority

Rule 23(b)(3) also requires analysis of whether the class action is superior to individual litigation. As the Third Circuit noted in *In re General Motors*, 55 F.3d at 800, "[i]n settlement situations, the superiority requirement arguably translates into the question whether the settlement is a more desirable outcome for the class than individualized litigation, and may assure that the settlement has not grossly undervalued plaintiffs' interests." This case involves a large number of small property damage claims with no personal injury component. Since the settlement provides a significant enhancement of compensation available to class members, the settlement represents a far more desirable outcome than individual litigation for the class members.

In sum, the requirements of Rule 23 are satisfied for purposes of certifying a settlement class. Accordingly, CertainTeed respectfully requests that the Court certify the proposed Settlement Class for purposes of effectuating the proposed Settlement.

## II.     The Settlement Should Be Preliminarily Approved.

The Settlement should be preliminarily approved because, for the reasons set forth herein and in Plaintiffs' Memorandum in Support of their Motion for Preliminary Approval ("Plaintiffs' Memorandum") at 17-25, it is a fair, reasonable, and adequate settlement that was the result of arms-length negotiations.

In this Circuit, when a court is evaluating whether a proposed settlement should be preliminarily approved, "the Court is required to determine *only* whether 'the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval.'" *Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007) (*emphasis added*) (quoting *Thomas v. NCO Fin. Sys.*, No. 00-5118, 2002 WL 1773035, at *5 (E.D. Pa. July 31, 2002)). Indeed, at the preliminary approval stage, the Court "'need not reach any ultimate conclusions on the issues of fact and law that underlie the merits of the dispute.'" *Id.* Instead, the "common inquiry is whether the proposed settlement is the result of arms-length negotiations." *Id.*; *Thomas*, 2002 WL 1773035, at *5; *Tenuto v. Transworld Sys., Inc.*, No. 99-4228, 2001 WL 1347235, at *1, (E.D. Pa. Oct. 31, 2001). Here, the Settlement Agreement, attached as Exhibit 1 to Plaintiffs' Memorandum, reveals that the terms of the Settlement are fair and that there are no deficiencies such as unduly preferential treatment of the class representatives or segments of the class or excessive compensation of attorneys.

Further, it is beyond dispute that the Settlement resulted from arms-length negotiations between Plaintiffs' counsel and CertainTeed's counsel. As pointed out in Plaintiffs' Memorandum, these negotiations took place over an eighteen month period, during which counsel for both parties vigorously advocated for their clients' respective positions. Moreover, the Settlement was only reached after three years of litigation, during which CertainTeed expended a great deal of time and money defending against Plaintiffs' claims. For example,

CertainTeed produced hundreds of thousand of pages of documents in response to Plaintiffs' discovery requests. Additionally, CertainTeed took the depositions of numerous class representatives and conducted several home inspections to inspect the condition of Plaintiffs' shingles. The length, expense, and adversarial nature of the settlement negotiations and the litigation itself reveal that this Settlement was the product of an arms-length agreement.

**III.  The Court Should Direct Notice Of The Settlement As Set Forth In The Notice Program Agreed Upon By The Parties.**

Finally, CertainTeed requests that the Court direct notice of the Settlement as set forth in the proposed notice program agreed upon by the parties. To satisfy due process, notice to class members "must be such as is reasonably calculated to reach interested parties" and "apprise [them] of the pendency of the action." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "The court should consider both 'the mode of dissemination and its content to assess whether notice was sufficient.'" *Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining and Manufacturing Co.*, 513 F.Supp.2d 322, 328 (E.D. Pa. 2007) (quoting *In re Diet Drugs*, 369 F.3d 293, 308-10 (3d Cir. 2004)).

"[I]n a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e)." *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 226 F.R.D. 498, 517 (E.D. Pa. 2005); *see also Grunewald, M.D., et al. v. Kasperbauer, et al.*, 235 F.R.D. 599, 609 (E.D. Pa. 2006) ("[W]here parties seek to simultaneously certify a settlement class and settle a class action, the elements of Rule 23(c) notice (for class certification) are combined with the elements of Rule 23(e) notice (for settlement).").

As to the content of the notice, Rule 23(c)(2)(B) requires that "[t]he notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the

definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B). For notices relating to a proposed settlement, courts within the Third Circuit have interpreted Rule 23(e) to require that "notice of a proposed settlement must inform class members: (1) of the nature of the pending litigation; (2) of the settlement's general terms; (3) that complete information is available from the court files; and (4) that any class member may appear and be heard at the Fairness Hearing." *In re Diet Drugs*, 226 F.R.D. at 517-18. "Although the 'notice need not be unduly specific ... the notice document must describe, in detail, the nature of the proposed settlement, the circumstances justifying it, and the consequences of accepting and opting out of it.'" *Bradburn*, 513 F.2d at 328 (quoting *In re Diet Drugs*, 226 F.R.D. at 518). Review of the proposed Notices (Exhibits E, F, G, H, and I to the Settlement Agreement) will show that they have been carefully crafted to comply with each of these requirements.

With respect to the particular media and scope of publication of the notices, under Rule 23(c)(2)(B), "the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."[6] Fed. R. Civ. P. 23(c)(2)(B). Courts have consistently found that "first-class mail and publication regularly have been deemed adequate under . . . Rule 23(c)(2)[(B)]." *Zimmer Paper Prods.*, 758 F.2d at 91. Courts have also found individual notice coupled with dissemination via television broadcasts or the Internet to meet the requirements of Rule 23(c)(2)(B). *Boone v. City of Philadelphia*, No. 05-1851, 2009 WL 3646398, at *11 (E.D. Pa.

---

[6] Rule 23 "effectively incorporated the [*Mullane*] due process standards. . . ." *Zimmer Paper Prods. Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985).

Nov. 3, 2009) ("Because individual notices were sent to all identified class members and because the notice was widely disseminated through local publications and television broadcasts, the Court finds that the notice given meets the requirements of Rule 23(c)(2)(B).").

To ensure that the Notice Program for the proposed Settlement meets or exceeds these standards, Class Counsel and CertainTeed have engaged CAC Services Group LLC ("CAC") to design and implement a class action settlement notice program ("the Notice Program"). CAC utilizes sophisticated statistical methodologies to estimate the probable reach of class action settlement notices, and it has successfully developed and directed numerous national class action settlement notification programs throughout the United States. *See* Affidavit of CAC's Vice President Matthew P. Hanson, ("Hanson Affidavit") at ¶¶ 3 and 4. Here, CAC has developed a program of direct mail to the Settlement Class members who are known to CertainTeed and Class Counsel and publication notice through a variety of media for the rest of the Class.

The direct mail notice portion of the Notice Program capitalizes on the fact that CertainTeed and Class Counsel have the names and addresses of approximately 45,000 potential class members, most of whom have been identified through CertainTeed's warranty program. In addition, at least another 1,000 building owners have contacted CertainTeed or class counsel during the course of this litigation. Therefore, CertainTeed is in possession of contact information for over 46,000 claimants. Under the proposed Notice Program, direct mail notice will be sent to each of these potential class members. In addition, direct mail notice will be sent to 2,405 condominium, townhouse and housing associations through the United States; 4,646 single family home construction companies and U.S. roofing and siding companies, whose names and addresses are readily available; and all callers to a toll-free information line who request the Notice. *See* Hanson Affidavit at ¶ 11. Thus, the direct mail program targets not only known class members but also companies and organizations that may be able to alert potential class members about their rights under the proposed Settlement.

The publication portion of the proposed Notice Program was developed in response to the fact that the identity of the vast majority of class members is unknown because CertainTeed does

not sell its shingles directly to homeowners; its customers are distributors and wholesalers. These distributors then resell the shingles to roofers or contractors who then install them on their customers' roofs. *See* Walton Declaration at ¶ 3. Therefore, there is no comprehensive record of the buildings on which the shingles at issue have been installed. *Id.* While the parties have no records identifying all class members, they do know the geographic areas where the overwhelming majority of the shingles had been applied. The shingles were manufactured at only two CertainTeed plants, one in Minnesota and one in Ohio. Walton Declaration at ¶ 5. CertainTeed's sales data during the years 1998-2005 (the years for which CertainTeed's this data is computerized), shows that approximately 94% of the shingles were sold to distributors in nine states (Iowa, Illinois, Indiana, Michigan, Minnesota, North Dakota, Nebraska, South Dakota, and Wisconsin), and there were no sales at all to distributors in eight states (Alaska, Arizona, Florida, Hawaii, Mississippi, Nevada, Oregon, and Vermont). *See* Walton Affidavit at ¶ 5. Similarly, during the years 1987 to 1997, over 90% of CertainTeed's organic shingles were sold to distributors in the same nine states -- Iowa, Illinois, Indiana, Michigan, Minnesota, North Dakota, Nebraska, South Dakota, and Wisconsin. *See* Walton Declaration at ¶ 6.

With respect to Canadian sales, during the years 1998-2005 (again, the years for which the sales data is computerized), CertainTeed sold a total of approximately 123,000 squares of Organic Shingles to distributors in Canada. These sales represent less than 0.77% of CertainTeed's total sales of organic asphalt shingles in those years. CertainTeed's sales in Canada in the years between 1987-1997 earlier years show a similar sales pattern. *See* Walton Affidavit at ¶ 7.

To reach the unknown class members who constitute the majority of the class, CAC has designed a comprehensive and widespread media campaign that will advertise the Settlement in newspaper supplements, on television, in trade publications, and on the Internet. *See* Hanson Affidavit at ¶ 13. In designing this media campaign in light of the relevant facts, CAC's proposed Notice Program provides general national outreach in the United States and outreach in the relevant parts of Canada, while focusing its advertising effort most heavily in the nine states

where approximately 94% of the shingles at issue are located (hereinafter referred to as the "Regionally Targeted Area"). A summary of the specifics of the media campaign follows.

*Newspaper notice.* Notice advertisements in the newspaper supplements will be inserted into 136 newspapers reaching every major media market in the Regionally Targeted Area. *See* Hanson Affidavit at ¶ 14. The Notice advertisement will consist of a 2/5's page size advertisement inserted three times into Parade Magazine, which is circulated to 6.4 million households in the Regionally Targeted Area. *See* Hanson Affidavit at ¶ 14.

*Television notice.* The television advertisement portion of the media plan will include the following:

    a.    60 second spot advertisements on thirteen different cable networks in Michigan, Indiana, Illinois, Nebraska, Minnesota and Wisconsin. There will be a total of twenty-five advertisements per week per cable network for 5 weeks, equaling 125 total advertisements per cable network;

    b.    Because cable is not predominately available in North Dakota, South Dakota and Iowa, in those states 60 second spot advertisements will air on the three major television networks (ABC, CBS, NBC). There will be a total of 104 advertisements per week per network, for five weeks, totaling 520 total advertisements per network;

    c.    To reach the national audience in the United States, 60 second spot advertisements on four different cable networks (The Weather Channel, Fox News Channel, HGTV Channel, ESPN2) will appear nationally with ten advertisements per week for one week, for a total of ten advertisements per cable network; and

    d.    To reach the Canadian class members, 60 second spot advertisements will appear on four different cable networks directed at the Canadian target audience. There will be ten advertisements per week for one week, for a total of ten advertisements per cable network.

*See* Hanson Affidavit at ¶ 15.

*Internet notice.* The internet advertising portion of the media campaign will include the following:

    a.    Paid advertising on the internet search engines Google, Yahoo and Bing. The notice advertisements will appear when the user completes an internet search that is topically related to the product, litigation, or settlement;

  b.  A posting of the summary notice on TopClassActions.com; and

  c.  A classified on-line only advertisement in the *National Roofing Contractors Association*, an online trade journal, which has an estimated circulation of 230,000 user sessions per month.

*See* Hanson Affidavit at ¶ 16.

  *Trade Journals.* The media campaign will include the following insertions in trade journal publications directed to members of the roofing industry, U.S. and Canadian roofing contractors, architects, property owners and managers, new home builders and professional renovators:

  a.  A full page display advertisement will be placed once in the *Qualified Remodeler*, which has an estimated circulation of 81,500;

  b.  A full page display advertisement will be placed once in the *Roofing Contractor*, which has an estimated circulation of 27,000;

  c.  a full page display advertisement will be placed once in *The Building*, which has an estimated circulation of 30,000. *The Building* is Canada's number one building magazine, and it reaches architects, contractors, property owners and property managers; and

  d.  a full page display advertisement will be placed once in the *Home Builder*, which has an estimated circulation of 76,000. *Home Builder* is Canada's number one magazine for new home builders and professional renovators.

*See* Hanson Affidavit at ¶ 17.

  CAC estimates that this media campaign will reach 96.38% of adult homeowners located in the U.S. and Canada with an average estimated frequency of 56 times, delivering a possible 10,280,414,605 opportunities to see the advertisement. *See* Hanson Affidavit at ¶ 18. Moreover, in the Regionally Targeted Area an estimated 97.17% of the target audience will be reached with an average estimated frequency of 321 times, delivering a possible 8,349,810,859 opportunities to see the advertisement. *See* Hanson Affidavit at ¶ 18.

  In sum, CAC has developed a comprehensive Notice Program that will: (1) ensure that all of the likely class members whose addresses are available will receive the Long-Form Notices of the Proposed Settlement and of the Final Approval Hearing ("the Notice"); (2) provide published notice of the Settlement that will reach an estimated 96% of all adult homeowners located in the

United States and Canada; and (3) provide published notice of the Settlement that will reach an estimated 97.17% of adult homeowners in the geographic area where CertainTeed sold approximately 94% of its Organic Shingles. *See* Hanson Affidavit at pars. 11 and 18; *see also* a Comprehensive Description of the Notice Program attached as Exhibit 1 to the Hanson Affidavit. CertainTeed respectfully submits that the proposed Notice Program will provide the best notice practicable under the circumstances of this case and will conform to all aspects of Federal Rule of Civil Procedure 23. Therefore, this Court should direct notice of the Settlement in accordance with the Notice Program agreed upon by the parties.

Plaintiffs' Motion for the Preliminary Approval of Class Action Settlement similarly requests the Court to direct that notice of the proposed Settlement be provided to absent Class Members in a manner consistent with the Proposed Notice Program and the Settlement Agreement and its exhibits (p. 2). However, Section IV.C. of their Memorandum of Law (pp. 25-27) could be read to suggest that the Court should hold a separate hearing in connection with that request. Class Counsel Michael McShane and Arnold Levin have subsequently confirmed to CertainTeed's counsel that they were referring to the hearing for preliminary approval of the Settlement which the Court has now set for December 23, 2009. Accordingly, all Parties to the Settlement Agreement join in the request that, at the hearing scheduled for December 23, 2009, the Court address certification of the Settlement Class, preliminary approval of the Settlement Agreement, scheduling of a fairness hearing to consider final approval, and providing notice to the Settlement Class about the proposed Settlement Agreement and the Settlement Class Members' rights in connection therewith.

## CONCLUSION

For the foregoing reasons, CertainTeed respectfully requests that the Court enter an order substantially in the form of the proposed order attached as Exhibit D to the parties' Settlement Agreement, certifying this case as a class action for settlement purposes only, preliminarily approving the Settlement, setting a Final Approval Hearing, and directing notice of the

Settlement to the Settlement Class Members as set forth in Notice Program agreed upon by the parties.

                Respectfully submitted,

                /s/Arlene Fickler
                Lawrence T. Hoyle, Jr.
                Arlene Fickler
                Ellen M. Briggs
                Tammi Markowitz
                **Hoyle, Fickler, Herschel & Mathes LLP**
                One South Broad Street, Suite 1500
                Philadelphia, PA 19107
                (215) 981-5700

                Attorneys for Defendant CertainTeed Corporation

Dated:  December 18, 2009

## CERTIFICATE OF SERVICE

I, Tammi Markowitz, certify that I electronically filed the above CertainTeed Corporation's Memorandum In Support Of Plaintiffs' Motion For Preliminary Approval Of Class Action Settlement on December 18, 2009, with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

_____
Tammi Markowitz

Dated: December 18, 2009