## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In Re: Certainteed Corp. Roofing      :        MDL DOCKET NO. 1817
Shingle Products Liability Litigation

                             :

This document relates to          :
ALL CASES

                             :

Pollak, J.                                               August 27, 2010

I. PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. THE SETTLEMENT AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
     A. Eligibility and Claims Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
     B. Incentive Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III. MOTION FOR CERTIFICATION OF THE CLASS . . . . . . . . . . . . . . . . . . . . . 16
     A. The Proposed Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
     B. Rule 23(a) Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
     C. Rule 23(b)(3) Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV. MOTION FOR FINAL APPROVAL OF THE SETTLEMENT AGREEMENT . . 25
     A. Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
     B. Approval of the Proposed Settlement Agreement . . . . . . . . . . . . . . . . . . . . 34
         (1) The Complexity, Expense and Likely Duration of the Litigation . . . . 37
         (2) The Reaction of the Class to the Settlement . . . . . . . . . . . . . . . . . . . . 38
         (3) The Stage of the Proceedings and the Amount of Discovery Completed
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
         (4) The Risks of Establishing Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
         (5) The Risks of Establishing Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
         (6) The Risks of Maintaining the Class Action through the Trial . . . . . . . 46
         (7) The Ability of the Defendants to Withstand a Greater Judgment . . . . 48
         (8) The Range of Reasonableness of the Settlement Fund in Light of the
         Best Possible Recovery and (9) the Range of Reasonableness of the
         Settlement Fund to a Possible Recovery in Light of all the Attendant Risks
         of Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

V. CONCLUSION ................................................. <u>53</u>

OPINION

Now before this court are class counsel's motion for certification of the class and defendant CertainTeed and class counsel's motion for final approval of the proposed settlement agreement, which received preliminary approval on December 29, 2009. For the reasons presented below, the court finds that the proposed settlement agreement is fair, reasonable, and adequate.

I. PROCEDURAL HISTORY

This class action arises out of the alleged failure of CertainTeed Organic Roofing Shingles. CertainTeed, the defendant in this case, has manufactured roofing shingles for more than a century. Beginning in 2005, CertainTeed began to receive complaints that the company's organic shingles were deteriorating prematurely and that the compensation provided in the express warranty was insufficient. The first federal case against CertainTeed was filed in the Eastern District of Pennsylvania on September 15, 2006.[1] Subsequently, an additional twenty actions were filed throughout the country relying on eight different state law causes of action.[2] On February 16, 2007, the Judicial Panel on

---

[1] *Catherine Barrett v. CertainTeed Corp.*, C.A. No. 2:06-4117 (E.D. Pa.).

[2] *Bd. of Dirs. of the Lake Katherine Townhome Ass'n, Inc. v. CertainTeed Corp.*, No. 00-3535 (N.D. Ill. filed June 11, 2009); *Gross v. CertainTeed Corp.*, No. 09-4029 (D.S.D. filed Mar. 16, 2009); *Elliot v. CertainTeed Corp.*, No. 08-252 (S.D. Ohio filed Apr. 9, 2008); *Helmick v.*

Multi-District Litigation consolidated thirteen class actions before this court.

The consolidated amended complaint alleges: (1) breach of contract and express warranty claims; (2) misrepresentation claims, including violations of the Pennsylvania Unfair Trade Practices Act, unjust enrichment, and fraudulent concealment; (3) violation of implied warranty claims; and (4) tort claims based in strict liability and negligence. On April 16, 2007, the court appointed Arnold Levin of Levin, Fishbein, Sedran & Berman as Liaison Counsel. The court also appointed Robert K. Shelquist of Lockridge, Grindal & Nauen, LLP, Michael McShane of Audet & Partners, LLP, and Jon Cuneo of Cuneo, Gilbert & Laduca, LLP, as co-lead counsel.[3] On May 30, 2007, CertainTeed, represented by Arlene Fickler and Lawrence Hoyle, of Hoyle, Fickler, Herschel &

_____

*CertainTeed Corp.*, No. 07-222 (D. Neb. filed June 8, 2007); *Eldridge v. CertainTeed Corp.*, No. 07-38 (D.N.D. filed May 31, 2007); *Rybarczyk v. CertainTeed Corp.*, (S.D. Ind. filed May 4, 2007); *Crocco, et al. v. CertainTeed Corp.*, No. 07-1373 (N.D. Ohio filed May 11, 2007); *Chiacchierini, et al. v. CertainTeed Corp.*, No. 07-6210 (W.D.N.Y. filed Apr. 26, 2007); *Venhaus, et al. v. CertainTeed Corp.*, No. 07-1189 (E.D. Pa. filed Mar. 26, 2007); *Robinson v. CertainTeed Corp.*, 07-12 (S.D. Ill. filed Jan. 8, 2007); *Bobbie v. CertainTeed Corp.*, No. 06-4835 (E.D. Pa. filed Oct. 9, 2006); *Swinehart v. CertainTeed Corp.*, No. 06-4469 (E.D. Pa. filed Oct. 6, 2006); *Butz, et al. v. CertainTeed Corp.*, No. 06-14357 (E.D. Mich. filed Oct. 3, 2006); *Fitzner v. CertainTeed Corp.*, No. 06-488 (W.D. Ky. filed Sept. 25, 2006); *Dunker et al. v. CertainTeed Corp.*, No. 06-4243 (E.D. Pa. filed Sept. 22, 2006); *Hollis v. CertainTeed Corp.*, No. 06-525 (W.D. Wis. filed Sept. 20, 2006); *Barrett v. CertainTeed Corp.*, No. 06-4117 (D.N.J. filed Sept. 15, 2006); *Johnson v. CertainTeed Corp.*, No. 06-4864 (N.D. Ill. filed Sept. 8, 2006); *Brenden, et al.*, No. 06-3579 (D. Minn. filed Sept. 5, 2006); *Conrad v. CertainTeed Corp.*, 06-420 (S.D. Iowa filed Aug. 31, 2006); *Harper, et al. v. CertainTeed Corp.*, No. 04-400 (E.D. Tenn. filed Aug. 31, 2004).

³ On April 17, 2007, the court appointed both co-lead counsel and liaison counsel to act as interim class counsel. Accordingly, when this opinion refers to "class counsel" it refers jointly to lead counsel and liaison counsel. For final appointment of counsel following certification of the class, *see infra* note 9.

- 3 -

Mathes, LLP, filed their answer to the consolidated amended complaint. The pretrial litigation process was lengthy. For approximately three years, the parties engaged in an extensive discovery process, which included depositions, interrogatories, on-site inspection of roofs, analysis of sample shingles, and review of thousands of pages of documents. At the same time, the parties attempted to reach a settlement agreement.

On December 15, 2009, plaintiffs filed a motion for preliminary certification of the class and preliminary approval of the class action settlement. The court held a preliminary approval hearing on December 29, 2009. On December 29, 2009, the court issued an order granting: (1) preliminary approval of the proposed settlement; and (2) preliminary certification of the class pursuant to Fed. R. Civ. P. 23(b)(3). The court also ordered the dissemination of a notice in accordance with the notice program set forth in the proposed agreement. The order appointed Catherine Barrett, Roger Dunker, and Sherwood Wolfson as the settlement class representatives in this matter. It also reaffirmed the appointment of liaison counsel and co-lead counsel. The final fairness hearing, at which the court would decide whether to certify the class and approve the proposed agreement, was scheduled for June 8, 2010.

Putative class members were informed through the notice program on the procedures for objecting to or withdrawing from the class action settlement. Prior to the final fairness hearing, the court received approximately 446 objections from class members. Three hundred sixty-three of those objectors were represented by the

California law firm of Capretz & Associates. In advance of the final fairness hearing, the Capretz firm also filed 593 opt-outs (83 class members filed both objections and opt-out forms). On April 26, 2010, Capretz filed a brief in support of objections to the proposed settlement agreement.

On May 4, 2010, class counsel filed a motion for attorneys' fees. On May 25, 2010, class counsel moved for final approval of the settlement agreement and certification of the settlement class. On the same day, CertainTeed filed a brief in support of the motion for final approval of the settlement agreement. On June 1, 2010, objecting counsel filed a motion in opposition to class counsel's motion for attorneys' fees. It appears that, in light of these concerns, the parties and objectors then returned to the drawing table to renegotiate and clarify certain provisions of the proposed settlement agreement.

The final fairness hearing was preceded by a flurry of last-minute briefings. On June 7, 2010, the day before the final fairness hearing, a memorandum of understanding ("MOU") between class counsel and CertainTeed clarifying and modifying several provisions of the proposed settlement that had troubled the objectors was transmitted to the court. Thus, the proposed agreement before the court on June 8, 2010 was substantively different from the agreement that had been previously presented to the court and class members. At the final fairness hearing, the court heard from class counsel, CertainTeed, and attorneys representing individual objectors or groups of

objectors. Class counsel briefed the court on: (1) the procedural posture of the case; (2) whether the proposed agreement was fair, reasonable, and adequate under Rule 23; (3) the changes and clarifications contained in the MOU; (4) the types of objections presented by the objectors; and (5) class counsel's fee petition. Lastly, the court heard from the following objectors: (1) James Capretz, representing 362 objectors; (2) Larry Karlin, an attorney representing the Lake Katherine Townhome Association, Inc., who informed the court that his clients wished to withdraw their objections to the settlement agreement; and (3) an attorney for Roger Dunker, a named plaintiff and class representative objecting to the agreement on the grounds that the incentive payments provided to named plaintiffs were insufficient. Mr. Capretz outlined how his firm had assisted the settlement progress and identified the main objections to the agreement held by his clients. Noting the recent changes to the proposed agreement set forth in the MOU, Mr. Capretz requested additional time to: (1) inform his clients about the changes to the proposed settlement agreement; (2) determine whether his clients would continue to object or withdraw their objections, per his recommendation; and (3) inform the court of the status of the objections. Towards the end of the hearing CertainTeed moved for court approval of the proposed agreement as fair, reasonable, and adequate.

Given the eleventh-hour changes to the agreement that arose prior to the hearing, the court scheduled a status conference hearing for July 21, 2010, which would give objecting class members' counsel the opportunity to inform their clients about the

modifications to the settlement and advise the court of the number of continuing objectors and opt-outs. On July 20, 2010, the court was once again the recipient of last-minute submissions. The first–a motion for common-benefit fees and expenses pursuant to the Memorandum of Understanding and the "settlement contract," submitted by James Capretz of Capretz & Associates, Willard P. Techmeier from the Cochran Firm (formerly the Techmeier Law Firm), Ronald Laba from the Law Offices of Ronald B. Laba, Paul Goltz from the Law Office of Paul M. Goltz, and David Cohen from the Law Office of David J. Cohen–asked the court to grant counsel's motion for fees, but did not identify the amount of fees sought (docket no. 194). After the close of business that day, the court received an "addendum" to the petition filed by James Capretz from Capretz & Associates, Steven Randall from Pearson, Randall, Schumacher & Labore, and Loren Dorshow from Griffel & Dorshow, asking for $2,017,681.00 in attorneys' fees and $83,587.99 in expenses. The addendum advised the court that "approximately 460 Class claimants who had previously opted-out" were choosing to opt back in to the settlement agreement.

Present at the status conference held on July 21, 2010 were: (1) Robert Shelquist, Michael McShane, Arnold Levin and Charles Schaffer as class counsel and liaison counsel; (2) Arlene Fickler and Lawrence Hoyle for CertainTeed; and (3) James Capretz and Stephen Randall for objectors and opt-outs. Because there was some uncertainty as to the final number of objectors and opt-outs to the settlement agreement, the court asked

the parties to submit that information to the court, in writing, as soon as possible. Given the modifications to the class counsel's attorneys' fee request and in light of the legal issues raised in the fee request made by counsel representing objectors and opt-outs, the court also ordered fresh briefing from the parties on the matter of attorneys' fees.

On July 23, 2010, the court received correspondence from Robert Shelquist of the law firm of Lockridge, Grindal, and Nauen, confirming the final number of objectors and opt-outs. On July 30, 2010, the Cochran Firm and the firm of Capretz & Associates filed a "Status Report on Opt-Out and Objector Claimants." They explained that they had sent two letters—the first on June 18, 2010 and the second on July 27, 2010–to objectors advising them of the changes to the class action settlement and requesting that they advise counsel whether they were withdrawing their objections, continuing their objections, or opting out of the class. According to the status report, as of July 30, 357 of the 363 objectors they represent were withdrawing their objections to the proposed settlement agreement. The remaining six objectors had not responded to counsel's request for information. The firms also reported that 489 out of 593 clients who had originally chosen to opt out of the settlement had elected to opt back in. Two clients informed counsel that they would continue to opt out of the settlement, and 102 clients had not responded as of July 30, 2010.

On August 12, 2010, the court received a proposed order for final approval of the class action settlement from CertainTeed. This submission also contained defendant's

final estimate as to the number of objectors and opt outs. Defendant informed the court that, of the 363 objectors represented by Capretz & Associates, all but one chose to withdraw their objections and remain in the settlement class.[4] As to the 83 objectors represented by other counsel or appearing pro se, the parties reported that five objections had been withdrawn. Thus, there are 78 objectors remaining. CertainTeed also reported that of the original 593 opt-outs represented by Capretz & Associates, 92 decided not to withdraw their request for exclusion from the settlement class. In addition, 96 opt-outs represented by other counsel or pro se did not with withdraw their request for exclusion. These figures were confirmed at the status conference held on August 17, 2010.

## II. THE SETTLEMENT AGREEMENT

The essential terms of the settlement agreement are set forth below.

### A. Eligibility and Claims Process

Persons are eligible to become class members if they either currently own a building using CertainTeed Organic Shingles or if they previously owned the building and retained the right to make a claim for the shingles pursuant to a valid documented assignment. The proposed settlement applies to individuals and entities that own "homes, residences, buildings, or other structures located in the United States or Canada

---

[4] One joint objector, John and Geraldine Flanagan, chose to request exclusion from the class.

whose roofs contain or contained roofing shingles made with felt reinforcement base material that is saturated with asphalt, also known as organic roofing shingles." Under certain circumstances, a claimant who replaced the roof of her building and then sold or transferred the building can also make a claim under the settlement agreement. The settlement covers only those claims related to the roof structure or roofing system of the building. It does not cover any damages to the interior part of the structure below the roof deck. In addition, the shingles must have suffered one of the seven types of damage that are covered by the settlement agreement.[5] However, an individual who has suffered one of the seven forms of damage may nonetheless be ineligible for compensation if

---

[5] As set forth by section 3.6 of the settlement agreement, the following forms of damage are covered:

(a) an open hollow bump, 19 mm or more in diameter, in the coating layer of the shingle resulting in the underlying asphalt being weathered (that is, oxidized and dirty), also known as "blistering";

(b) corners and edges of shingle tabs that are curled downward toward the deck surface raising the portion of the tab just interior to the edges by more than ½', also known as "clawing"; (c) cracks in the top-coating of the shingle penetrating through the organic felt that present a source for leakage, also known as "cracking";

(d) tab corners that are raised above the plane of the deck by more than ½' on shingles manufactured more than ten years before the submission of the claim, or by at least 3/8'on shingles manufactured less than ten years before the submission of the claim, also known as "curling";

(e) tab corners that are raised above the plane of the deck by at least 3/4' after being placed in a freezer at 0° for 15 minutes, also known as "cold weather curling";

(f) puckers of at least 1/4' that appear along the side and bottom edges of the tabs, also known as "fishmouthing"; and

(g) a loss of top surface of the shingle resulting in an exposure of the substrate equal in size to a dime, also known as "spalling."

CertainTeed can establish that one of several "Causation Defenses"[6] principally and

directly caused the damage.

    In order to receive compensation, a claimant must complete and submit a claim

---

[6] The "Causation Defenses" are assertable by CertainTeed when it is able to establish damage caused by:

(a) intentional, reckless, or negligent conduct of a party other than CertainTeed;

(b) roof deck movement, settlement, distortion, or failure;

(c) settlement, distortion, failure, or cracking of the walls or foundation of the building;

(d) and/or resulting from natural disaster, including but not limited to, hail, unusually strong storms or winds of a speed greater than that set forth in the applicable written limited warranties for the shingles at the time they were sold, lightning, fire, hurricane, flood, earthquake, earth movement, explosion, or other similar force majeure events;

(e) structural changes or alterations to the property after the shingles were installed, including but not limited to, installation of equipment on the roof (such as solar heating or air conditioning equipment, TV antennas or satellite dishes, fan housing, water towers, and signs) or any other modifications;

(f) improper racking of shingles;

(g) installing the shingles over Non-Approved Roof Decks, as defined in the agreement;

(h) improper installation or failure to follow good installation or application processes, including but not limited to, failure to install in strict accordance with CertainTeed's installation instructions applicable to the Claimant's CertainTeed Organic Shingles at the time of their installation, use of the shingles as ridge material, inadequate or improper use of fasteners, use of the shingles for any purpose other than as roof cladding, improper or inadequate installation of eave flashing, rake and eave drip edges, and other flashings;

(i) inadequate attic or roof ventilation, as recommended by National Roofing Contractor's Association and Asphalt Roofing Manufacturer's Association;

(j) installing the shingles directly over decks insulated with rigid insulation board (on homes or buildings with cathedral ceilings), if there does not exist at least one inch of free-flowing air space between the deck to which the shingles are applied and the rigid insulation board;

(k) excessive or unreasonable traffic on the roof;

(l) storage of shingles that were installed more than two years after they were manufactured;

(m) improper maintenance such as pressure washing, failure to remove vegetation, moss, algae, fungus, lichens, mold or mildew growth from the roof, or failure to remove trees from contact with the roof;

(n) installation on any plane less than 4/12 pitch where ice and water underlayment or two layers of felt were not installed; and

(o) ice backup or ice damming.

- 11 -

form. The "standard claim form" contains an explanation of how to complete the form. The form itself is eight pages long and asks a series of questions pertaining to the claimant's information, description of the property where the shingles were installed, and details about the installation and condition of the shingles. The agreement states that the claims process is to be managed by a "Claims Office" established by CertainTeed, which would also set up a toll-free telephone number to assist in processing the claims. Claimants are to agree to provide access to the property and to provide information establishing ownership of the property and purchase of the relevant shingles. CertainTeed agrees under the settlement agreement to reimburse the claimant up to $50 for the expenses incurred in having a roofing professional remove and replace the sample shingle necessary to make a claim. The agreement further provides that CertainTeed is to have the right to remove any part of the roofing structure necessary to determine whether a causation defense exists, but CertainTeed is obliged to then restore the claimant's property to its prior condition. Finally, a claimant is required to submit a sample shingle and photographs of the damaged structure. An "abbreviated claim form" may be submitted if the claimant had previously filed a warranty claim with CertainTeed. A class member may also opt out of the settlement class by sending written notification of his exclusion to class counsel by first-class mail.[7]

_____

[7] The written notification must contain certain information (signature, address, number of properties affected by the shingles). Class members who exclude themselves from the settlement cannot later object to it, but they may withdraw their opt out requests prior to the effective date if

Upon receiving a claim, CertainTeed is to evaluate the claim and determine whether the claimant qualifies for compensation. Compensation is measured in terms of "squares" of shingles–one square is 100 square feet of roofing shingles. The amount of compensation a claimant will receive under the settlement agreement depends in part on whether he or she is covered by the original warranty. The original warranty program that covers the shingles includes two major components. First, all shingles are covered by the "SureStart protection" program wherein CertainTeed agrees to repair or replace, at no cost, any shingles proven to contain a manufacturing defect during a specified period of time after installation (3 to 5 years, depending on the type of shingle installed). The second component of the warranty program covers the remainder of the warranty period, which varies according to the shingles installed. Under that program, compensation for any defects in the shingles are reduced *pro rata* by the years of service the shingles have already provided.

The settlement agreement maintains the SureStart program. Claimants whose shingles are found to be defective during the period still covered by SureStart will receive the highest level of compensation. Compensation for claimants who are still covered by the warranty period, but not by the SureStart period, will receive less

---

they accept the terms of the settlement agreement. Should the number of class members deciding to opt out of the settlement reach a level that "threatens to frustrate the essential purpose of [the settlement agreement]," then CertainTeed in its sole discretion may unilaterally void the agreement. Set. Agr. ¶ 10.7.

- 13 -

compensation. Those claimants will receive $74/square. Of that, $34/square will be for replacement of the shingle and $40/square for labor and other materials. If the claim is received (or postmarked) within ten years of the installation of the shingles, the $34/square for the replacement shingles will be prorated from the date of installation, but the $40/square for labor and other materials will not be prorated. If the claim is received more than ten years after installation of the shingles, but prior to the expiration of the applicable warranty period, the entire $74/square will be prorated.

Claimants who have already settled their claims under the CertainTeed warranties will be subject to a different calculation. In addition, claimants who have previously settled their claims (as of August 1, 2006) and executed a release of their claims will receive compensation equal to 20% of the difference between the amount received under the warranty and any greater amount that the claimant would have received under the settlement agreement. They will receive compensation only for the cost of labor and other materials and not for the cost of the replacement shingles.

Claimants who are not covered by the warranty—because they were not the original owners of the building and the CertainTeed warranty was not transferred to them—will receive $34/square for replacement shingles and labor ($15.64/square for the cost of replacement shingles and $18.36/square for the cost of labor and other materials). Compensation will also be prorated. Proration is based on the number of months remaining on the original CertainTeed warranty as of the date the claim is received by

- 14 -

the claims office and the amount of time the claimant benefitted from the shingles before they became damaged.

The proposed settlement agreement also establishes a process for denials and appeals. If CertainTeed denies a claim, it must inform the claimant of the basis for its decision. A claimant has the right to appeal the denial of all or part of the claim to an Independent Claims Administrator ("ICA").[8] During that appeal, the ICA, the claimant, class counsel, or CertainTeed may request that an Independent Inspector physically inspect the premises and the evidence. If the ICA determines that the claim was fraudulent or that the shingles at issue were not CertainTeed Organic Shingles, the claimant shall be obligated to pay $200. The final, written, decision of the ICA can be appealed on the ground that it failed to comport with the terms of the settlement agreement, in which case either class counsel or CertainTeed may appeal the case to a Special Master. During this process class counsel shall have a continuing responsibility to assist claimants and ensure that Certainteed, the ICA, and the Special Master are properly applying the terms of the agreement.

## B. Incentive Payments

The settlement agreement provides for an incentive payment to thirteen named plaintiffs. Three other named plaintiffs may also qualify for an incentive payment, once

---

[8]    The ICA, who serves a six-month term and is a roofing specialist, is chosen by class counsel and CertainTeed, or if the parties cannot agree, by this court. The ICA selects an Independent Inspector, who must also be an experienced roofing professional.

they provide CertainTeed with samples of the shingles on their buildings. If the named plaintiff was deposed, the named plaintiff's incentive payment will be $5,000; if the named plaintiff was not deposed, the named plaintiff's incentive payment will be $2,500.

## III. MOTION FOR CERTIFICATION OF THE CLASS

Class actions may be certified for settlement purposes only. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.*, 55 F.3d 768 (3d Cir. 1995), *cert. denied*, 516 U.S. 824 (1995). In these types of class actions, the district court first approves preliminary certification of the class, thus enabling settlement negotiations to proceed. However, "the formal certification procedure [is postponed] until the parties have successfully negotiated a settlement." *In re Gen. Motors*, 55 F.3d at 786. Final certification *vel non* of the class is determined by the court at the same time as the court rules on whether the final settlement agreement is to be approved. *Id.* at 800. Until then, the "court indulges the assumption of the class's existence." *Id.* at 786. The class may be certified only if it complies with the requirements of Rule 23. *In re Community Bank of Northern Virginia*, 418 F.3d 277, 305 (3d Cir. 2005) ("[R]egardless of whether a district court certifies a class for trial or for settlement, it must first find that the class satisfies all the requirements of Rule 23.").

In this case, the court granted preliminary certification of the class under Rule 23(a) and (b) at a preliminary approval hearing held on December 29, 2009. On May 25,

- 16 -

2010, class counsel filed a motion for final approval of the settlement agreement and certification of the settlement class, and CertainTeed filed a brief in support of the motion for final approval of the settlement agreement. At the status conference on June 8, 2010, CertainTeed also moved for final approval of the settlement agreement. The issues presented by these two motions are distinct and must be examined separately.

## A. The Proposed Class

Special obligations attend the court when a class is certified for settlement purposes only. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (while a "district court need not inquire whether the case, if tried, would present intractable management problems . . . other specifications of the Rule–those designed to protect absentees by blocking unwarranted or overbroad class definitions–demand undiluted, even heightened, attention in the settlement context"). The court must apply a "heightened standard" of review. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) ("[W]here settlement negotiations precede class certification . . . we require district courts to be even more scrupulous than usual.") (internal quotations and citation omitted). The purpose of heightened review is "to ensure that class counsel has engaged in sustained advocacy throughout the course of the proceedings, particularly in settlement negotiations, and has protected the interests of all class members." *Id.*

Rule 23(a) authorizes certification of a class if four threshold conditions are met: (1) numerosity (a "class [so large] that joinder . . . is impracticable"); (2) commonality

("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical . . . of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class"). *Amchem*, 521 U.S. at 614. Further, a class action satisfying the requirements of Rule 23(a) can be certified only if the class can be maintained under one of the three subsections of Rule 23(b). In this case, the parties seek certification pursuant to the third subsection–Rule 23(b)(3)–which provides that a class action may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## B. Rule 23(a) Requirements

The numerosity requirement calls upon the proponent of a class action to show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). "No single magic number exists satisfying the numerosity requirement." *Behrend v. Comcast Corp.*, 245 F.R.D. 195, 202 (E.D. Pa. 2007). However, the Third Circuit has suggested that this requirement is usually satisfied if the proposed class contains more than 40 plaintiffs. *Stewart v. Abraham*, 275 F.3d 220, 227-28 (3d Cir. 2001) ("[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."). In this case there is

- 18 -

no dispute that the conditionally certified class meets the numerosity requirement. CertainTeed estimates that, from 1987 to 2005, approximately 1,857,000 structures were built using CertainTeed organic shingles. While the class is almost certainly not that large, the fact that CertainTeed has resolved more than 50,000 claims thus far and that 115,000 claims have been filed since April of 2008 suggests that the class consists of hundreds of thousands of class members. Accordingly, I find that the numerosity requirement is satisfied.

The second requirement of Rule 23(a) is that "there be questions of law or fact common to the class." Fed. R. Civ. P. 23(a). Commonality means "that the proposed class members share at least one question of fact or law in common with each other." *In Re Warfarin Sodium*, 391 F.3d at 528 (citing *Baby Neal ex. rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). However, in cases such as this one where the class sought to be certified is a Rule 23(b)(3) class, that rule's "predominance requirement, which is far more demanding, incorporates the Rule 23(a) commonality requirement."

In this case, there are common questions both of fact and law among the class members. The main question is whether CertainTeed's shingles failed before the expiration of their warranted life, and whether that failure was caused by a defect. These claims arise from the same theories of breach of warranty, strict liability, tort, and negligence. While there are differences in questions of fact–since each plaintiff would have to provide proof specific to that plaintiff's own shingles–this is not an impediment

- 19 -

here. This element does not require "that all putative class members share identical claims." *Baby Neal*, 43 F.3d at 56. Although these differences of fact might render the class unmanageable at trial, "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620. The fact that the settlement agreement covers only very particular forms of damage confirms the existence of factual and legal commonality among the claims.

The third requirement of Rule 23(a) is that the claims of the class representatives be "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). Typicality "is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *In re Warfarin Sodium*, 391 F.3d at 531. Typicality does "not require "that all putative class members share identical claims." *Id.* at 531-32. If the representative's claims "arise from the same alleged wrongful conduct on the part of [the defendant]" then this may be sufficient to satisfy the typicality requirement. *Id.* at 531. Under Rule 23, the court must also ensure that named plaintiffs do not have "interests antagonistic to those of the class." *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975). This "serves to uncover conflicts of interest between named parties and the class they seek to represent." *In re Diet Drugs*, 431 F.3d 141, 145 (3d Cir. 2005).

There is no evidence that the claims of the class representatives would be atypical of the putative class members; all claims are based on the failure of CertainTeed shingles and CertainTeed's liability for that failure. In addition, the legal theories available to the class members are grounded in the same claims made by the class representatives. As above, the settlement agreement's specific enumeration of the forms of damage covered ensures that the claims of the class representatives are typical of the claims of the class as a whole. *See Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3d Cir. 1992) ("Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members and if based on the same legal theory."). There is no conflict of interest between the class members and the named plaintiffs. The named plaintiffs, like the remainder of the class, claim to have suffered from defective CertainTeed shingles.

The fourth and final Rule 23(a) requirement is adequacy. The court must determine whether the representative plaintiffs can "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requirement encompasses two distinct inquiries designed to protect the interests of absentee class members: [first,] it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees'[;] and [second] it tests the qualifications of the counsel to represent the class." *In re Gen. Motors*, 55 F.3d at 800 (citations omitted). "Adequacy" is especially important in classes certified for settlement purposes because "collusion, inadequate

- 21 -

prosecution, and attorney inexperience are the paramount concerns in precertification settlements." *In re Gen. Motors*, 55 F.3d at 795 (citing *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968)).

In this case it is clear that the interests of the representative plaintiffs are aligned with those of the other members of the class. The remedies sought by and available to the plaintiffs are the same as those sought by and available to the remainder of the class. The procedural and substantive standards set forth in the settlement agreement must be satisfied both by the named representatives and by other class members. *See Prudential*, 148 F.3d at 313 (because both named plaintiffs and other class members would need to prove the same allegations "in order to succeed on any of the claims . . . the proposed class satisfies the adequacy of representation requirement of Rule 23(a)").

The second factor asks the court to determine whether "the plaintiff's attorney [is] qualified, experienced, and generally able to conduct the proposed litigation." *Wetzel*, 508 F.2d at 247. Class counsel in this case are more than qualified to represent the putative class members. Class counsel have established that they have substantial experience in litigating class actions and product liability cases. They have litigated and been named lead counsel in several other complex class action cases. Thus, their legal experience seems sufficient to meet this requirement. Class counsel have vigorously prosecuted this litigation by engaging in considerable discovery, defending a number of depositions, and participating in extensive negotiations with defendant. *See Grasty v.*

*Amalgamated Clothing & Textile Workers Union, etc.*, 828 F.2d 123, 129 (3d Cir. 1987) ("the assurance of vigorous prosecution" by class counsel is a "significant factor" in the Rule 23(a)(4) analysis). Fee structures can also tell us something about adequacy. *See In re Gen. Motors*, 55 F.3d at 801-03 (discussing impact of fees and award settlements on adequacy requirement). Attorneys' fees which are disproportionately large, or were negotiated at the same time as the agreement, or are contingent on the agreement, may suggest collusion or conflicts of interest. *Id.* at 803. Without ruling on the reasonableness of the attorneys' fees that are sought, the court takes note of the fact that they were discussed only "after all the material terms of the settlement were agreed upon," are not tied to the settlement agreement and will be paid separately by CertainTeed. Accordingly, this court concludes that representation in this area was adequate. This conclusion is borne out by the more than satisfactory representation of the class members that I have observed at several phases of this case.

## C. Rule 23(b)(3) Requirements

Counsel seek class certification pursuant to Rule 23(b)(3), which provides that a class action may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Predominance is "significantly more demanding" than the commonality requirement; it asks "whether the class is

- 23 -

sufficiently cohesive to warrant certification." *Newton v. Merrill Lynch, Pierce, Fenner*
*& Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001). As discussed earlier, plaintiffs raise
sufficiently common issues of fact and law to predominate over any individual issues
that might arise. While different claims may present distinct issues of fact regarding the
number of shingles damaged, the type of damage suffered, and whether those shingles
qualify for compensation, those differences do not affect the *cohesion* of the class.
These differences are relevant only as to whether a claimant is covered by the settlement
agreement.

Rule 23(b)(3) also requires that the class action mechanism be "superior" to other
methods of litigation. Fed. R. Civ. P. 23(b)(3). This court must determine "whether the
settlement is a more desirable outcome for the class than individualized litigation." *In re*
*Gen. Motors*, 55 F.3d at 796. The Rule suggests consideration of the following factors
in examining the superiority requirement:

(A) the class members' interests in individually controlling the prosecution or
defense of separate actions; (B) the extent and nature of any litigation concerning the
controversy already begun by or against class members; (C) the desirability or
undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

In this case, because of the size of the class, it would be manifestly inefficient to try each
case individually. Potential plaintiffs with smaller claims might find it difficult, or
unprofitable, to pursue their claims individually. This is one of the essential functions of
a class action. *Amchem Prods.*, 521 U.S. at 617 ("The policy at the very core of the class

- 24 -

action mechanism is to overcome the problem that small recoveries do not provide the

incentive for any individual to bring a solo action prosecuting his or her rights."). In the

case at bar, the class action mechanism both promotes judicial economy and provides a

greater number of potential plaintiffs with the opportunity to seek compensation.[9]


## IV. MOTION FOR FINAL APPROVAL OF THE SETTLEMENT AGREEMENT

### A. Notice

---

[9] Having granted final certification the class, this court "must appoint class counsel." Fed. R. Civ. P. 23(g)(1). *See also Sheinberg v. Sorenson*, 606 F.3d 130, 132 (3d Cir. 2010) ("[U]nder the plain language of the rule, a district court's decision to certify a class must precede the appointment of class counsel."). Rule 23(g) "lists four factors that must be considered" in so doing. *Id.* These are "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). This court "must also ensure that '[c]lass counsel [will] fairly and adequately represent the interests of the class.'" *Sheinberg*, 606 F.3d at 132-33 (quoting Fed. R. Civ. P. 23(g)(4)).

Plaintiffs in this case have thus far been represented by Arnold Levin, Robert K. Shelquist, Michael McShane, and Jon Cuneo (jointly, "class counsel"). Class counsel have capably shepherded this litigation on behalf of plaintiffs since the individual cases were consolidated into a multi-district matter, and have negotiated the settlement on behalf of plaintiffs. Counsel's work on the claims in this case has, in other words, been extensive, and has involved the expenditure of a substantial amount of resources. Class counsel also have substantial experience in litigating class actions and product liability cases, and have litigated and been named lead counsel in several other complex class action cases. Counsel's work on this case and their prior experience also suffice to demonstrate that lead counsel have "fairly and adequately represent[ed] the interests of the class," and will continue to do so. Thus, to the extent that *Sheinberg* requires the court to appoint class counsel following "both class certifications and class re certifications" and to the extent that this court has not formally appointed counsel prior to this order, the court finds that lead counsel satisfy all four of the Rule 23(g) factors.

Before considering the merits of the proposed agreement, this court must determine whether notice of the settlement comported with the Due Process Clause and the pertinent requirements of Rule 23.

In a Rule 23(b)(3) class, notice of the class action must meet the requirements of both Rule 23(c)(2) and Rule 23(e). The two rules serve related, but distinct, purposes: "Rule 23(c) describes the notice to class members when a court certifies a class, while Rule 23(e) describes the notice required for settlement." *Grunewald v. Kasperbauer*, 235 F.R.D. 599, 609 (E.D. Pa. 2006). Notice must also satisfy due process and be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (citations omitted). "[W]here the parties seek to simultaneously certify a settlement class and settle a class action, the elements of Rule 23(c) notice (for class certification) are combined with the elements of Rule 23(e) notice (for settlement)." *Grunewald*, 235 F.R.D. at 609 (citing *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90-91 (3d Cir. 1985)).

Rule 23(c)(2), which sets forth the notice requirements for class certification, requires the court to direct the "best notice that is practicable under the circumstances." Notice must be written in "plain, easily understood language" and be "clear." Fed. R. Civ. P. 23(c)(2)(B). Notice must also contain the following specific information:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion;

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). The second set of requirements are contained in Rule 23(e), which is "designed to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 445 (E.D. Pa. 2008). Rule 23(e) states that, prior to approving the settlement, the court must "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).

In this case, the court has directed notice to be served to putative class members on several occasions. On December 13, 2007, the court granted liaison counsel and CertainTeed's joint motion to disseminate notice of the pending litigation to all property owners who had applied CertainTeed roofing shingles to their roof and to whom CertainTeed had offered a warranty settlement or release. That order was modified on December 14, 2007, to require CertainTeed to send the notice in the same mailing in which CertainTeed communicated its warranty settlement offer to each property owner. The court's December 29, 2009 order granting preliminary approval of the settlement

agreement also directed notice to class members. CertainTeed's memorandum in support of plaintiffs' motion for preliminary approval contained an exhaustive explanation of the proposed notice program, including examples of the various forms of notice and estimates on the number of individuals that would be reached.

As set forth in the December 29, 2009 order, the notice program consisted of the following: (1) Long Form Notices and claim forms to be mailed to each member of the class as identified by the parties through reasonable efforts; and (2) Short Form Notices of the agreement. The latter were to be published as follows: "(1) three weeks of print publication in Parade Magazine's Midwestern editions; (2) five print notice placements in U.S. and Canadian trade journals; (3) a 60 second television notice airing on four national cable networks, nine Midwestern cable networks, and four Canadian cable networks; (4) internet notice on web properties such as Google, Yahoo, and Bing; and (5) an informational press release issued to PR Newswire (U.S. and Canada)." Order Prelim. App. ¶ 10. Notice was to be published in January, February, and March 2010. Order Prelim. App. ¶ 10. To implement and design the notice program, the parties agreed to hire CAC Services Group, LLC, a company that designs and administers class action settlement notification programs. On March 4, 2010, the court approved an order expanding the number of cable television networks and broadcast stations which would air the CertainTeed settlement advertisement.

In moving for final approval of the settlement agreement, CertainTeed has submitted an affidavit by Matthew Hanson, the Vice President of CAC Services Group, LLC. Aff. Hanson (docket no. 185). The affidavit states that, as of June 7, 2010, notices and claims forms had been sent to approximately 70,821 individuals and businesses, including condominium, townhouse and housing associations and construction and roofing or siding companies, while 1,806 notices remained undeliverable by the U.S. Postal Service. Television advertisements were aired primarily in the nine states (North Dakota, South Dakota, Iowa, Minnesota, Michigan, Illinois, Indiana, Nebraska, and Wisconsin) where approximately 94% of the shingles appear to have been sold, but in addition, thirty-five advertisements were also broadcast over national and Canadian television networks. In the nine-state region targeted by CAC, approximately 773 advertisements aired on twenty-seven cable networks in six states (Illinois, Indiana, Michigan, Minnesota, Nebraska, and Wisconsin), and the other three states (Iowa, North Dakota, and South Dakota) received 1,212 advertisements on twenty-four local stations. The regional television advertisements ran from February 1 to March 21, 2010. Printed notice consisted primarily of short-form notices published in "PARADE" magazine, a magazine which is a Sunday supplement distributed in 140 newspapers located in the ten states (North Dakota, South Dakota, Nebraska, Minnesota, Iowa, Wisconsin, Illinois, Michigan, Indiana, and Ohio) where approximately 95% of CertainTeed shingles are understood to have been sold.

The *type* of notice disseminated in this case satisfies Rule 23. First, direct mailing of the type undertaken in this case has been found to satisfy Rule 23. *See Zimmer Paper Prods.*, 758 F.2d at 90-91 (noting that first class mail and publication have "regularly been deemed adequate under the stricter notice requirements" and that Third Circuit cases establishing "maximum notice" policy in class actions "requir[e] only first-class mail and publication"). The Supreme Court has stated that Rule 23(c)(2)'s "best notice" language requires that "[i]ndividual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). The record shows that CertainTeed has sent out approximately 69,000 direct mailings to individuals and associations containing notice forms. Those sent to townhouse or housing associations presumably reached more than one class member. The direct mailing program was accompanied by publication in newspapers and trade journals designed to reach a significant number of class members. It seems clear that CertainTeed's comprehensive efforts to identify individual class members and send them notices by mail constitute adequate compliance with Rule 23(c)(2). *See, e.g., Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 963-64 (3d Cir. 1983) (notice consisting of direct mailing and publication in two newspapers was adequate under Rule 23); *Steiner v. Equimark Corp.*, 96 F.R.D. 603, 614 (W.D. Pa. 1983) (individual first-class mail is "best notice practicable" under 23(c)(2)). Television advertisements notifying potential class

members of the proposed settlement were broadcast in regions where CertainTeed shingle sales were concentrated. From February 1 to March 21, 2010, television advertisements appeared 3,840 times on 55 local and 30 cable stations in the nine states where approximately 94% of CertainTeed shingles are understood to have been sold. Television advertisements were also placed on U.S. and Canadian national networks, although they were broadcast only seventy times in total.

The notice program also made extensive use of the Internet. First, CertainTeed created a website (www.CertainTeedSettlement.com) where putative class members could access information about the class action, including the long and short form claim forms and other documents relating to the litigation. The website also contained separate sections, or "pages," setting forth: (1) the relevant dates for submitting claims and objections to the class membership; (2) an explanation of the rights and restrictions associated with class membership; (3) directions for obtaining and completing a claim form; (4) the requirements for class membership and claim eligibility; (5) contact information for the claims administrator; and (6) an explanation of putative class members' choices, including the right to object to the proposed settlement and the right to withdraw from membership and hence from the settlement as well. The information contained in the website was well organized, written in plain English, and easy to understand. In addition, internet advertisements were also published in a targeted geographic region. The administrator of the program estimates that 522,274 internet

advertisements were seen by potential class members and "17,599 potential Class Members click[ed] through to the Settlement Website." Aff. Hanson ¶ 40. Hanson estimates that approximately 21,474 class members requested notice packets through the website. An additional 1,862 individuals used the "contact" form on the website to request follow-up contact from CertainTeed.

It is clear that the parties set out to ensure that notice was both geographically broad and targeted to reach the demographically relevant market. In addition, the program made use of a wide variety of publication methods, thus increasing the likelihood that putative class members would receive notice of the class action and settlement. *Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 709 (E.D. Pa. 2009) (notice program consisting of direct mailings, television advertisements, a website and toll-free phone number satisfied notice requirements of Rule 23).

In addition, the substantive information contained in the notice complied with the Rule 23 requirements. The fifteen-page long form notice contained the following information: (1) subject-matter of the class action; including type of shingle and purchase dates covered by the class action; (2) explanation of how to submit a claim; (3) explanation of legal rights and choices available to class members, including the right to request exclusion, object, appear at the hearing, and send in a claim form; (4) explanation of benefits of settlement; (5) contact information for class counsel; (6) date, time and place of the final fairness hearing before the court; (7) procedures and deadlines

for objecting to the agreement; (8) binding effect of the settlement; and (9) brief notice that attorneys' fees would be requested and incentive payments made to named plaintiffs. The short form notice contained the same information, but in abbreviated form. Print advertisements explained: (1) the type of shingles and dates covered by the class action; (2) the terms of the settlement; (3) the legal rights of class members, including the right to request exclusion, object, and appear at the hearing; (4) the intent of attorneys to petition for fees; and (5) the details for contacting the CertainTeed claims administrator, and website and toll-free phone number for obtaining additional information. According to the television advertisement script provided in the notice plan, that advertisement also conveyed the necessary information.

Thus, the substantive information contained in the notice complied with the specific requirements of Rule 23(c) and hence were sufficient under Rule 23 and due process. *See Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 329 (E.D. Pa. 2007) (finding "adequate under the due process clause and Rule 23" notice which "describes the nature and background of this action and defines the Class, Class claims, and consequences of Class Membership . . . summarizes the terms of the Settlement, including information relating to the size of the Settlement Fund; the release provisions of the Settlement; and the attorneys' fees, expenses, and incentive award"). That information, of course, would be of limited use had it not been clearly written, readable, and presented in a logical manner. Ultimately, the success of the notice program is

confirmed by the number of individuals who observed the various advertisements, the number of claim forms disseminated, and the number of claims received by CertainTeed. *In re Pet Food Prods.*, Case No. 07-2867, 2008 WL 4937632, at *12 (D.N.J. Nov. 18, 2008) (finding that "notice has been provided in a reasonable manner to potential class members" because "a total of 28,955 notices were directly mailed to potential class members, the Settlement website had received over 38,039 visits, and over 8,150 calls were placed to the toll-free Settlement telephone number" ). Accordingly, I conclude that the notice program instituted by the parties was successful and satisfied the requirements contained in Rule 23(e) and Rule 23(c).

### B. Approval of the Proposed Settlement Agreement

A settlement agreement may be approved only if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The burden of establishing fairness, reasonableness, and adequacy lies on the proponents of the settlement. *In re Gen. Motors*, 55 F.3d at 785. In assessing whether the proposed agreement satisfies Rule 23, the court has an obligation to "act[] as a fiduciary who must serve as a guardian of the rights of absent class members." *Id.* The Third Circuit has adopted a nine-factor test to aid courts in determining whether a settlement agreement is fair, reasonable, and adequate. *See Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975). That test requires courts to evaluate the following factors:

(1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 157 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)). Courts

must make factual findings regarding these nine factors. *See In re Gen. Motors*, 55 F.3d

at 785 ("The findings required by the *Girsh* test are factual . . . .") (citations omitted).

However, the Third Circuit has noted that:

[S]ince *Girsh* was decided in 1975, there has been a sea-change in the nature of class actions, especially with respect to mass torts. In this regard, it may be useful to expand the traditional Girsh factors to include, when appropriate, these factors among others: the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential Ins.*, 148 F.3d at 323. Nevertheless, the Third Circuit generally looks to

the *Girsh* factors in assessing a class action settlement. *See, e.g., In re Ins. Brokerage*

*Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009) (applying *Girsh* factors); *In re SFBC*

*Intern. Inc.*, 310 Fed. Appx. 556, 558 (3d Cir. 2009) ("[T]he District Court properly exercised its discretion in approving the settlement. The District Court examined the *Girsh* factors in detail, exercised its own independent judgment, and made on-the-record findings in support of its approval of the settlement."). This court may look to the *Prudential* factors if, "depending on the facts of a given case[,] . . . [it is] useful to expand the traditional *Girsh* factors." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 259 (3d Cir. 2009) (quoting *Prudential, supra*).

CertainTeed and class counsel contend that the agreement is entitled to a presumption of fairness. A proposed settlement agreement is entitled to a presumption of fairness where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *See In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001). There is a "strong presumption in favor of voluntary settlement," particularly in "class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010) (internal quotation and citation omitted). The presumption of fairness may attach even where a class is certified for settlement purposes only, as long as the requirement of adequate representation has been satisfied. *In re Warfarin Sodium*, 391 F.3d at 535. For the reasons set forth below, the

court concludes: the settlement agreement is (1) entitled to a presumption of fairness, and (2) fair, reasonable, and adequate under Rule 23.

(1) The Complexity, Expense and Likely Duration of the Litigation

"This factor is intended to capture 'the probable costs, in both time and money, of continued litigation.'" *In re Gen. Motors*, 55 F.3d at 812 (citing *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974)). It allows the court to "gauge the benefit of settling the claim amicably" compared with the "costs of continuing on the adversarial path." *In re Gen. Motors*, 55 F.3d at 812. In assessing this factor, courts have looked at a number of issues, including: (1) the amount of discovery that would be required, *see id.*; (2) the number of pretrial motions that would be filed, *see id.*; and (3) the length of a trial. *See also In re Warfarin Sodium*, 391 F.3d at 536 ("We agree with the District Court's conclusion that this factor favors settlement because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial.").

In this case, the complexity, expense, and likely duration of the litigation weigh in favor of approving the proposed settlement. CertainTeed states that if settlement is not accomplished, it would likely move for decertification of the class and file a motion for summary judgment. In addition, if the case thereafter proceeded to trial, the court would need to determine what state law applied to individual class members and then apply that

law, a complicated process because of the number of class members. The discovery process would be lengthy and expensive: CertainTeed is in possession of 882 gigabytes (approximately 26,500,000 pages of material) of potentially relevant digital information. In order to produce that information, defendant submits that it would need to employ forensic information technologists to convert the data, review that information for privilege and relevance, and then produce the information to plaintiffs, a process that might add up to half a million dollars in technical expenses. The court would be called upon to manage that discovery, which would take months, if not years.

(2) The Reaction of the Class to the Settlement

The Third Circuit has looked to the number of objectors from the class as an indication of the reaction of the class. *See In re Cendant*, 264 F.3d at 234-35 (noting the factor of class reaction favored approval "as the number of objectors was quite small in light of the number of notices sent and claims filed"). Typically, the reaction of the class is gauged by looking at the percentage of objections received in relation to the class as a whole. *See, e.g., Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 251 (D.N.J. 2005) (because only .06% of the class members opted out of the settlement, factor favored approval of the settlement); *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1313-14 (3d Cir. 1993) ("[l]ess than 30 of approximately 1.1 million shareholders objected. . . . This small proportion of objectors does not favor derailing settlement"). "[P]aucity of protestors . . . militates in favor of the settlement." *Bolger*, 2 F.3d at 1314.

- 38 -

In this case, by the time of the December 29, 2009 fairness hearing, the court had received approximately 438 objections. Of these, 363 objectors were represented by the law firm of Capretz & Associates (although CertainTeed argued that at least 7 were not class members). An additional 695 putative class members chose to opt out of the settlement. However, following the changes to the proposed settlement agreement as set forth in the Memorandum of Understanding, the number of objectors and opt-out class members changed.

Thus, as of the date of this opinion, 78 claimants continue to object to the settlement agreement, and 188 have decided to opt out of the settlement agreement. Class counsel state that there are 1.8 million affected structures; this would mean that objecting class members represent less than 0.01% of the potential class members. However, this figure may overestimate the number of individuals who will actually submit warranty claims and be eligible for compensation. Even assuming a smaller class–which seems more likely–the number of objectors and opt-outs is not significant. According to class counsel, from September 1, 2006 to September 30, 2007, CertainTeed resolved approximately 19,250 pre-existing warranty claims and received 15,650 new claims. Pl. Mem. Law Class Cert. 15. As of May 21, 2010, CertainTeed has received 25,000 claims forms. Walton Aff. ¶ 30 (Exhibit A, Def. Mem. Law Final App.). Mr. Shelquist stated at the August 17, 2010 status conference that approximately 40,000 claims had been filed with CertainTeed.

Thus, even a more conservative estimate for the size of the class–for example, approximately 40,000 class members (the number of claims currently filed)–confirms that the number of remaining objections and opt-outs is very small. In addition, this reveals that a large number of class members received notice of the class action, but chose not to object or opt out, suggesting that this factor weighs in favor of settlement. *See In re Cendant Corp. Litig.*, 264 F.3d at 235 ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement."). Moreover, the fact that approximately 367 objectors withdrew their objections to the settlement, and at least 501 opt outs chose to return to the fold confirms that this version of the proposed settlement agreement is satisfactory to a large majority of the class. Accordingly, this court finds that this factor weighs strongly in favor of settlement.

The court also received an objection from named plaintiff Roger Dunker, who objected to the final settlement agreement on the basis that the incentive award fee of $5,000 is inadequate for his service as a class representative, which included obtaining counsel, documenting and maintaining records, making his home available for inspection, and being deposed once.

District courts may approve incentive payments to plaintiffs in class action suits. *See, e.g., Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) ("[C]ourts

routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."). Named plaintiffs play an important role in class actions, and "it is surely proper to provide reasonable incentives to individual plaintiffs whose willingness to participate as lead plaintiffs allows class actions to proceed and so confer benefits to broader classes of plaintiffs." *Briggs v. Hartford Fin. Servs. Grp. Inc.*, No. 07-CV-5190, 2009 WL 2370061, at *16 (E.D. Pa. July 31, 2009). *But see First State Orthopaedics v. Concentra, Inc.* 534 F. Supp. 2d 500, 524 (E.D. Pa. 2007) (Rule 23 "contemplates no special treatment for plaintiffs in class action suits, and this Court strongly disapproves of excessive awards of 'incentive' payments to named plaintiffs"). In this case, I find that an incentive award of $5,000 adequately takes into account Mr. Dunker's contributions to the litigation. *See, e.g., Chemi v. Champion Mortg.*, No. 05-CV-1238, 2009 WL 1470429, at *13 (D.N.J. May 26, 2009) (approving highest award of $5,000 to plaintiff who "[took] the lead in this litigation" and was "extremely active in this case"; authorizing payment of $3,000 for two other plaintiffs who "provid[ed] counsel with documents and information during discovery and making themselves available for depositions" and $1,000 for plaintiffs that filed the initial state claims).

(3) The Stage of the Proceedings and the Amount of Discovery Completed

This factor "captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether

- 41 -

counsel had an adequate appreciation of the merits of the case before negotiating." *In re Gen. Motors*, 55 F.3d at 813. In settlement class actions, because there has been no final determination that a class exists, "the mere fact that negotiations transpired does not tend to prove that the class's interests were pursued." *Id.* Class counsel may have less incentive to aggressively prosecute class members' interests. Thus, the court must ensure that class counsel "adequately developed the claims before deciding to settle." *Bolger*, 2 F.3d at 1314.

This is not one of those cases where a settlement was reached shortly after the case began. *Compare In re Gen. Motors*, 55 F.3d at 814 (settlement achieved only four months after filing of initial complaint weighed against approval), *with Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) (settlement discussions did not commence until after four years of discovery supplemented by another investigation by a trustee and after plaintiffs rejected first settlement offer). This litigation was initiated in 2006, and the Judicial Panel on Multi-District Litigation consolidated the cases in February 2007. Thus, more than three years, if not four, elapsed before a settlement was negotiated. *Id.* at 813 ("Given the purpose of this inquiry . . . it is more appropriate to measure the stage by reference to the commencement of proceedings either in the class action at issue or in some related proceeding."). In addition, following the submission of several hundred objections, the parties re-negotiated certain provisions of the proposed agreement. The

current version of the proposed agreement thus takes into account the principal concerns identified by the objectors.

Moreover, the discovery process–which has been proceeding since at least 2007–has been extensive. Discovery has consisted of considerable document review, depositions, and inspections. During their representation of the class, class counsel: (1) reviewed approximately one million documents and analyzed hundreds of thousands of pages of documents through discovery; (2) established contact with thousands of property owners; (3) performed five on-site property inspections; and (4) retained three experts. Class counsel also deposed CertainTeed employees and defended 17 depositions of plaintiffs. Accordingly, I find that this factor weighs in favor of approving the settlement.

### (4) The Risks of Establishing Liability

The fourth *Girsh* factor calls on the district court to examine "what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *In re Gen. Motors*, 55 F.3d at 814. If it would be difficult for a plaintiff to establish liability, this factor favors settlement.

CertainTeed submits that it would invoke a number of strong factual and legal defenses if the case were to proceed to trial. First, defendant would have a number of factual defenses showing that the failure of the shingles at issue was caused by other factors, such as improper installation or storage. Second, CertainTeed would argue that

the breach of contract claims fail because the warranties provide compensation in the event that the shingles should fail prematurely, and that the express warranty does not constitute an "unconditional promise" that the shingles will function throughout the covered period. The breach of express warranty claim would fail, CertainTeed submits, because under Pennsylvania law, the plaintiff must prove actual reliance on the warranty in making the purchase. CertainTeed also argues that plaintiffs would encounter a number of difficulties in proving the misrepresentation claims, which are premised on the theory that CertainTeed knowingly used the warranty as a marketing tool, but that the length of (and compensation provided in) the warranty was insufficient compared to the expected duration of the product. Moreover, a substantial portion of plaintiffs' implied warranty claims would likely be barred by Pennsylvania's four-year statute of limitations. Pa. Const. Stat. Ann. § 2725. Finally, defendant points out the difficulties plaintiffs would encounter in proving their tort claims. First, plaintiffs would need to show that CertainTeed breached a duty of care in the manufacturing process to succeed on their negligence claim. Second, with regard to the strict liability claim, they would need to show that the shingles were "unreasonably dangerous."

Although class counsel maintain that plaintiffs would prevail at trial, counsel concede that the litigation has "inherent risks" and that CertainTeed would be able to raise a number of defenses. Class counsel further point out that, even if they were able

- 44 -

to show liability, they would encounter additional difficulties in determining the appropriate amount of damages.

"In examining [the fourth factor], the Court need not delve into the intricacies of the merits of each side's arguments, but rather may 'give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'" *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) (quoting *Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa.1997)). This factor plainly weighs in favor of settlement. Plaintiffs' claims present difficult questions of liability, both because of the defenses available to CertainTeed, and because of the potential differences presented by each individual claim. In addition to CertainTeed's legal defenses, the proposed settlement agreement's enumeration of several "causation defenses" further demonstrates the challenges facing plaintiffs were the case to proceed to trial. Victory for class members is not assured. Given these risks, this factor weighs in favor of approving the proposed agreement.

### (5) The Risks of Establishing Damages

This factor, like the last, involves a balancing of risks. Here what must be assessed is the "expected value of litigating the action rather than settling it at the current time." *In re Gen. Motors*, 55 F.3d at 816. If liability were to be established, plaintiffs submit that "they would still be faced with providing the appropriate amount of damages

against Defendants." However, I am not persuaded that this factor weighs strongly in favor of approval. The damages computation would be relatively simple; in fact, CertainTeed's warranty program already provides a system for computing damages. This would not necessarily become a "battle of the experts" or present difficult issues for a jury. *Cf. In re Cendant*, 264 F.3d at 239 (because "the damages determination proffered by Lead Plaintiff's expert is complex and hard to follow, freighted with involved calculations and conceptually difficult issues" and a jury might be "confronted with competing expert opinions of corresponding complexity" this factor weighed in favor of approval). In the instant case, this factor weighs only slightly in favor of approval.

(6) The Risks of Maintaining the Class Action through the Trial

"[T]his factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *In re Warfarin Sodium*, 391 F.3d at 537. When the risk of decertification is high, this factor weighs in favor of the settlement agreement, but when "the risk of decertification appears to be extremely slight," the factor is "really neutral." *In re Cendant*, 264 F.3d at 239. Under Rule 23, a district court has the authority to decertify a class at any stage in the litigation. Fed. R. Civ. P. 23(a). Thus, "proceeding to trial would always entail the risk, even if slight, of decertification." *In re Cendant*, 264 F.3d at 239. The gravity of that risk, however, varies from case to case.

Because a number of factors that do not impede certification for settlement purposes may nonetheless render the class unsuitable for trial, the risk of decertification in this case is significant. *In re Warfarin Sodium*, 391 F.3d at 537 ("Although Appellants' concerns about the manageability of a multistate class of consumers . . . did not pose a problem for the certification of a settlement class, there is a significant risk that such a class would create intractable management problems if it were to become a litigation class, and therefore be decertified."). CertainTeed argues that three factors have the potential to make this class unmanageable at trial: (1) the absence of evidence of a common defect among the shingles; (2) the need for individualized proof from each plaintiff; and (3) the difficulty of applying the different state laws. CertainTeed also draws the court's attention to *NatureGuard Cement Roofing Shingles Cases*, No. 276768 (Cal. Super. St., Stanislaus Co. June 23, 2006), where a state court decertified a class action alleging defective roofing shingles because there were no "common issues relating to liability or damages on the express warranty . . . [and] [t]he right of each class member to recover under the warranty or [the state statute] causes of actions depends on unique facts peculiar to his case."

CertainTeed's points are persuasive. In this case, the proposed agreement itself states that damage suffered by the shingles can be the result of at least seven types of damages. At trial, each of these types of damage would require different forms of proof, and each claim would be subject to a number of legal and factual defenses presented by

CertainTeed. Thus, the risk of decertification is significant and this factor weighs strongly in favor of approving the settlement agreement.

(7) The Ability of the Defendants to Withstand a Greater Judgment

As the phrase suggests, the seventh prong of the *Girsh* test asks the court to assess CertainTeed's ability to pay a greater judgment, including a greater settlement amount, than the current settlement. *In re Cendant*, 264 F.3d at 240. In order to assess this factor courts often consider the defendant's financial status. *Id.* (noting that district court examined defendant's financial ability); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 540 (D.N.J. 1997) ("There is evidence that a greater judgment likely would adversely affect Prudential's credit rating, which has already declined during these proceedings, and would, thereby, affect Prudential's ability to compete, its revenues, and its profitability."), *aff'd*, 148 F.3d 283 (3d Cir. 1998). In this case, neither party has provided us with any specific information concerning CertainTeed's ability to pay a larger sum. In such a setting, it is open to the court to find that this factor is neutral. In *In re Warfarin Sodium*, the Third Circuit addressed a case where the posture was similar:

> The District Court found that this factor neither favored nor disfavored settlement because of a lack of evidence in the record about [defendant's] ability to pay or whether such a consideration factored into the settlement negotiations. Appellants . . . contend that the District Court should have inquired into [defendant's] ability to pay a higher settlement amount in determining whether the settlement was adequate. Although the plaintiffs do not dispute that [defendant's] total resources far exceed the settlement amount,

the fact that [defendant] could afford to pay more does not mean that it is obligated to pay any more than what the consumer and TPP class members are entitled to under the theories of liability that existed at the time the settlement was reached. Here, the District Court concluded that [defendant's] ability to pay a higher amount was irrelevant to determining the fairness of the settlement. We see no error here.

391 F.3d at 537-38. Thus, because ability to pay was not an issue in the settlement

negotiations, this factor is neutral.

(8) The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and (9) the Range of Reasonableness of the Settlement Fund to a Possible Recovery in Light of all the Attendant Risks of Litigation

These last two elements "evaluate whether the settlement represents a good value

for a weak case or a poor value for a strong case. The factors test two sides of the same

coin: reasonableness in light of the best possible recovery and reasonableness in light of

the risks the parties would face if the case went to trial." *In re Warfarin Sodium*, 391

F.3d at 538. Typically, this requires the following calculation:

in cases primarily seeking monetary relief, the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement. This figure should generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside.

*In re Gen. Motors*, 55 F.3d at 806. Nevertheless, this court does not need to conduct a

full-fledged *General Motors* calculation. *See Prudential*, 148 F.3d at 322-23 (court's

analysis was sufficient under this factor even though court did not conduct "traditional [*General Motors*] calculus").

Both parties submit that these two factors weigh in favor of approving the settlement agreement. Class counsel write that they "have concluded that the Settlement results in a significant portion of potentially recoverable damage from CertainTeed" and are satisfied that the settlement will allow class members to recover costs and repair their roofs quickly. CertainTeed contends that the "best possible recovery" in this case would provide compensation for the entire cost of the shingles, labor, and other materials, not prorated for past use. In CertainTeed's view, the "most likely" recovery would be the amount recoverable under the existing warranties. Comparing these two, CertainTeed argues, shows that the agreement provides greater compensation than the existing warranties ("the most likely option"); thus the settlement provides good value. For example, under the warranty, owners whose shingles were proved defective after the SureStart period would be reimbursed only for the prorated replacement cost of the shingles, and not for labor and costs. The warranty provides $30 to $35/square, whereas the agreement provides $74/square (subject to proration) which includes labor costs. In addition, the CertainTeed warranties do not generally compensate individuals owning buildings whose shingles were already installed when they purchased the building (since the warranties do not cover transferees). However, the settlement agreement does provide some compensation for transferees. Finally, CertainTeed observes that under the

settlement agreement, those class members who have already settled their warranty claims will still receive 20% of the difference between the amount they received for their warranty claims and any greater amount they would have received under the settlement.

These factors weigh in favor of settlement. The settlement agreement provides more compensation in most cases than class members would receive under CertainTeed's warranty program. For most types of organic shingles, the CertainTeed warranty program provides less compensation than the settlement agreement. Compensation under the warranty is capped at $30 to $35/square for eight of the twelve types of organic shingles, whereas the settlement agreement provides $74/square. Both the agreement and the warranty program prorate compensation to take into account the use of the shingles that claimants have already enjoyed. Proration is typical for warranty payments. *See* U.C.C. § 2-714(2) (2003) ("[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted"). It seems reasonable to limit plaintiffs' recovery to at, or near, the warranty amounts considering that in prior litigated cases involving CertainTeed's defective shingles, recovery was more often than not limited to the amounts contained in the warranty. An affidavit submitted by Jeffrey S. Waksman, counsel in the law department of Saint-Gobain, the parent company of CertainTeed, shows that of the thirteen cases in which plaintiffs recovered damages for defective organic shingles between 2008 and 2010, the

plaintiffs's recovery was limited to the warranty amount in eight of those cases. In those cases where recovery was not limited to the warranty: (1) the first plaintiff was awarded $10 more than the warranty; (2) the second plaintiff was awarded $50 more; (3) the court used a higher amount per square value to calculate the third plaintiffs' recovery; (4) the fourth plaintiff obtained a default judgment against CertainTeed; and finally (5) the fifth plaintiff obtained a judgment in excess of warranty, but that case is currently on appeal. In addition, the settlement agreement provides compensation where the warranty would not: building owners who purchased a building where the shingles were already installed but did not receive the right to make claims under the warranty will nonetheless receive $34/square (subject to proration). Especially in light of the risks of proceeding to trial identified earlier, the settlement in this case appears reasonable. No settlement agreement is perfect, because all settlements are a "compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re Gen. Motors*, 55 F.3d. at 806.

In conclusion, the court finds that the *Girsh* factors weigh in favor of approving the agreement, and that it is not necessary to "expand" to the *Prudential* factors. Five of the Girsh factors weigh in favor of approving the settlement agreement. Those are: (1) the complexity, expense and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a

possible recovery in light of all the attendant risks of litigation. Two factors weigh "strongly" in favor of settlement: (6) the risk of maintaining the class action through the trial and (2) the reaction of the class to the settlement. The fifth factor, the risk of establishing damages, weighs slightly in favor of settlement, and, finally, the seventh factor, the ability of the defendants to withstand a greater judgment, is neutral.

## V. CONCLUSION

For the reasons set forth herein, this court grants final certification to the settlement class, approves the settlement, certifies class counsel, and approves the named plaintiff incentive awards. An appropriate order accompanies this opinion.